IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TYLER ELEVATOR,<br>nka Sematic USA, Inc., | ) | CASE NO. 1:04 CV 2434 |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| Plaintiff, | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| IRON WORKERS SHOPMEN'S | ) | **ORDER** |
| LOCAL UNION NO. 468 OF THE | ) | |
| INTERNATIONAL  ASSOCIATIONS | ) | |
| OF BRIDGE, STRUCTURAL, | ) | |
| ORNAMENTAL AND REINFORCING | ) | |
| IRON WORKERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## I.  Introduction

Plaintiff, Tyler Elevator, now known as Sematic USA, Inc. (Tyler),  has brought suit against defendant Iron Workers Shopmen's Local Union No. 468 of the International Associations of Bridge, Structural, Ornamental and Reinforcing Iron Workers to vacate an arbitrator's award and order, made pursuant to § 301 of the Labor-Management Relations Act of 1947.[1]  That decision reinstated defendant Theodore Staszko (Staszko), a member of the Union, to his employment at Tyler and awarded him lost wages, benefits and seniority.

Tyler contends that the arbitrator improperly imposed requirements on Tyler to consider mitigating factors in determining appropriate discipline that were not part of the

---

[1] 29 U.S.C. § 185(a).

collective bargaining agreement (CBA) governing the parties in this matter, that the award is contrary to public policy, and that the law on mitigation of damages was not applied.

The Union has moved for summary judgment, contending that there are no genuine issues of material fact involved in this dispute, that the arbitrator acted properly, and that it should prevail as a matter of law.[2]

Tyler has responded, restating its original claim that the Court should vacate the arbitrator's award.[3]  The parties have consented to the jurisdiction of the Magistrate Judge.[4] The matter was briefed and argued before the Court on November 2, 2005.

Upon review of the arguments advanced in the briefs and at oral argument, the Court concludes that the arbitrator's award did not conflict with, nor did it exceed, the terms of the CBA entered into between Tyler and the Union.  Nor did the award contravene public policy or misapply the law on mitigation of damages.  Tyler's motion to vacate the decision of the arbitrator, therefore, must be denied and the Union's motion for summary judgment granted.

## II.  Facts

### A.    The CBA and the work rules

Tyler and the Union entered into a collective bargaining agreement on September 1, 1998.[5]  The CBA, at Section 6(A), gives Tyler the "right to ... demote, suspend, discipline

_____

[2] ECF # 29.

[3] ECF # 31.

[4] ECF # 18.

[5] ECF # 22, Jt. Ex. 1.

or discharge for proper cause...."[6]  Section 6(B) of the CBA further provides that Tyler may

"establish, maintain and enforce reasonable rules and regulations to assure orderly plant

operation."[7]

Pursuant to that authority, on November 8, 2000, Tyler adopted Work Rule 13, which

states:

> Fighting or any other disorderly conduct; threatening, intimidating or
> interfering with fellow employees; distraction of other employees by
> unnecessary shouting or demonstrations; using obscene or abusive language
> to fellow employees, supervisors or customers is strictly prohibited.[8]

The introduction to the Work Rules further states:

> Violations of any of these procedures, rules and guidelines will result in
> disciplinary action.  Such action will be in the form of any one or more of the
> following: verbal reprimand, written reprimand, time off without pay, [or]
> discharge.  In each case, the disciplinary action to be taken will be determined
> by considering: [the] seriousness of the offense, employee's overall
> employment record, [and] previous disciplinary actions.[9]

These Work Rules were in addition to "Selected Employment Policies" also

promulgated by Tyler under the authority of Section 6(B) of the CBA and "[p]ublished to the

---

[6] *Id.* at 6.

[7] *Id.*

[8] ECF # 22, Jt. Ex. 3.

[9] *Id.*

collectively bargained employees on October 16, 2000."[10]  One of these Employment Policies states that:

> The Company does not tolerate any type of workplace violence committed by or against employees.  Employees are prohibited from making threats or engaging in violent activities. This is a zero tolerance policy, meaning that the Company disciplines or terminates every employee found to have violated this policy....  Any employee determined to have committed such acts will be subject to disciplinary action, up to and including termination.[11]

On November 13, 2000, Staszko acknowledged that he had received the November 8, 2000 revisions to the Work Rules and that he was obliged to "read and comply with these work rules."[12]

The CBA also sets forth a grievance and arbitration procedure by which an employee may challenge Tyler's disciplinary action.[13]  If a dispute reaches arbitration, the arbitrator, in deciding the matter, "shall not have the right to add to, subtract from, modify or disregard any of the terms or provisions of this Agreement."[14]

## B.    The conduct at issue and Tyler's disciplinary action

In her decision of October 13, 2004, Arbitrator Jane Minnich found the relevant facts concerning the conduct at issue to be as follows:

---

[10]  ECF # 22, Jt. Ex. 2.  Although Tyler maintained at oral argument that the Employment Policies were meant to "carve an exception" to the flexible discipline scheme of the Work Rules, the record shows that the Employment Policies preceded the Work Rules.

[11]  *Id.*

[12]  ECF # 22, Jt. Ex. 5.

[13]  ECF # 22, Jt. Ex. 1 at 19-20.

[14]  *Id*. at 20(a).

-4-

[Staszko's] discharge arose from an incident occurring on July 10, 2002, involving [Staszko] and a coworker, Anthony Priah. There is no dispute that on that date, [Staszko] approached Mr. Priah while he was working and informed him that he had parked in a space that [Staszko] considered to be his own parking space... Mr. Priah testified that he was a new employee on July 10, 2002, having only worked for the Company for one week. He maintained that [Staszko's] conversation with him on that date concerning his choice of parking spaces involved a threat. Mr. Priah explained that this fact was evident from [Staszko's] demeanor and tone, as well as his statement that he should not be in his spot when he returned from vacation....

As credibly described by Mr. Priah, [Staszko's] remarks on July 10, 2002 involved a threat. Based on his demeanor, words and tone, Mr. Priah reasonably perceived [Staszko] to be effectively stating "Don't park in my spot, or else." Contrary to the assertions of the Union, [Staszko's] conduct was not limited to shop or locker room talk, as it involved more than rough or obscene language.[15]

Subsequent to charging Staszko with violating Work Rule 13 and the "zero tolerance" policy toward workplace violence, Staszko was terminated by Tyler on July 15, 2002.[16] He filed a grievance with the Union that same day.[17] Upon failing to resolve the matter directly with Tyler, the Union invoked arbitration on September 24, 2002.[18]

## C. The arbitration and the arbitrator's opinion and award

At arbitration, the issue was whether Staszko's "termination was in violation of the Agreement."[19] The arbitrator initially concluded that Staszko was "appropriately charged"

---

[15] ECF # 19, Ex. D.

[16] ECF # 22, Jt. Ex. 11.

[17] ECF # 22, Jt. Ex. 13.

[18] ECF # 22, Jt. Ex. 20.

[19] ECF # 19, Ex. D at 5.

with violating Work Rule 13 and the "zero tolerance" policy.[20]  However, the arbitrator further determined that terminating Staszko for these infractions was "unduly harsh and therefore without proper cause."[21]

Consequently, the arbitrator imposed a seven-day suspension on Staszko and ordered him reinstated to his job, with lost wages, benefits and seniority restored.[22]  Staszko was also found to have mitigated his damages by being self-employed while terminated, entitling Tyler to a credit for that income in computing back pay.[23]

The arbitrator based her judgment that Staszko's termination was "unduly harsh" on factual findings that the offense was not severe.  First, the arbitrator noted that Priah did not seem "overly concerned" by Staszko's actions and "continued to park in the same spot."[24]  Further, Priah "neither reported the matter to Management nor sought Management's assistance," but Tyler had raised the issue itself.[25]  Finally, the arbitrator found that Staszko's seven-year employment record at Tyler revealed "little or no prior discipline" with "no prior discipline for similar conduct."[26]

---

[20] *Id.* at 6.

[21] *Id.* at 7.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 6-7.

[25] *Id.* at 7.

[26] *Id.*

Tyler here contends that the arbitrator's decision to consider such "mitigating factors" imposed requirements not found in the terms of the CBA, was based on the arbitrator's own notions of industrial justice, and is contrary to public policy requiring a safe workplace.[27] Tyler also argues that, contrary to the arbitrator's findings, Staszko "took no action whatsoever to mitigate his damages."[28]

## III.  Analysis

### A.    Standards of review

#### 1.    *Labor arbitration*

As the Sixth Circuit emphasized in *Way Bakery v. Truck Drivers Local No. 164*,[29] this Court has a limited role to play in reviewing decisions of labor arbitrators:

> [C]ourts play only a limited role when asked to review the decision of an arbitrator.  A court's review of an arbitrator's award is one of the narrowest standards of review in all of American jurisprudence.  Disagreements with an arbitrator's factual findings does not constitute grounds for a court's rejection of those findings.

> We must enforce the arbitrator's agreement as long as the award draws its essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice. [I]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.[30]

---

[27] ECF # 19 at 4-5.

[28] *Id*. at 5.

[29] *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590 (6th Cir. 2004).

[30] *Id.* at 593 (citations and quotation marks omitted).

In *International Union v. Dana Corp.*,[31] the Sixth Circuit employed a four-part test to determine if a labor arbitration award fails to draw its essence from the agreement.  An award will be beyond the scope of the agreement if:

> (1) [I]t conflicts with the express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general conditions of fairness and equity instead of on the exact terms of the agreement.[32]

## 2.    *Summary judgment*

As is well-established, summary judgment may be granted where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[33]  A reviewing court must draw all reasonable inferences from the facts in favor of the non-moving party.[34]

Here, the parties do not dispute any of the facts as found by the arbitrator.[35]

---

[31] *Int'l Union v. Dana Corp.*, 278 F.3d 548 (6th Cir. 2002).

[32] *Id.* at 554 (quoting *MidMichigan Reg'l Med. Ctr.--Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999)).

[33] Fed. R. Civ. P. 56(c).

[34] *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999).

[35] Tyler's contention that Staszko did not mitigate his damages does not contest the factual finding that Staszko was self-employed during his termination but argues that choosing self-employment should not be construed as mitigation, since Staszko made no "legitimate effort to obtain employment with comparable pay and benefits, as he is required to do so [sic] by the mitigation of damages doctrine...." ECF # 27 at 17.

-8-

Accordingly, since the Union's motion for summary judgment and Tyler's motion to vacate the arbitrator's decision both concern the same undisputed facts, raise identical issues, and are governed by the same standard of review, they will be here considered together.

**B.      Claimed grounds for vacating the award**

*1.      The award did not draw its essence from the agreement*

Tyler argues that the award here does not draw its essence from the CBA because Arbitrator Minnich's stated reasons for her decision were "adopted word-for-word" from another collective bargaining agreement between other parties, thereby imposing new requirements on Tyler.[36]   Specifically, Tyler objects to the arbitrator's statement that discipline for just cause "requires that the discipline imposed be corrective rather than punitive in nature, and be reasonable under the circumstances."[37] By employing terms allegedly drawn from another collective bargaining agreement, Tyler claims "the arbitrator applied a contract to this dispute that was not bargained for between these parties," which mandates that the award be vacated.[38]

Tyler maintains that in this matter "there is no discipline mitigating factor provision and there are no mitigation standards defined in the CBA."[39] By employing such factors in her decision, Tyler asserts that the arbitrator has "effectively rewritten the parties' CBA" and

---

[36] ECF # 31 at 2.

[37] ECF #19, Ex. D at 6.

[38] ECF # 31 at 2.

[39] ECF # 27 at 11.

imposed "obligations and rights that were neither bargained for or expressly made a part of the CBA by the parties."[40]

The Union contends that progressive discipline is a "well-established concept" of just cause and is inherent in Work Rule 13 in this case, which "expressly allows for a progression of discipline and for the employer to consider various mitigating factors in assessing discipline for infractions."[41]

The Union takes issue with what it describes as Tyler's "rather unbelievable claim" that the arbitrator here had to "dig for language buried in [a] dissenting [court] opinion" to support her reasoning.[42]  Rather, the Union maintains that arbitrator properly evaluated the discipline imposed on Staszko in light of the "alternative penalties and consideration of mitigating factors" contained in the Work Rules promulgated under the authority of the CBA.[43]

As previously noted here, the specific introductory language of the Work Rules issued pursuant to the CBA in this case states:

> Violations of any of these procedures, rules and guidelines will result in disciplinary action.  Such action will be in the form of **any one or more of the following:** verbal reprimand, written reprimand, time off without pay [and] discharge.  **In each case**, the disciplinary action to be taken **will be**

---

[40] *Id.*

[41] ECF # 30 at 3-4.

[42] *Id*. at 3.

[43] *Id.* at 4.

> **determined by considering: [the] seriousness of the offense, employee's overall employment record, [and] previous disciplinary actions.**[44]

Similarly, the "zero tolerance" for workplace violence provision of the Employment Policies states that "[a]ny employee determined to have committed such acts will be subject to disciplinary action, **up to and including** termination."[45]

Arbitrator Minnich's award is consistent with the progressive discipline approach of both the Work Rules and the Employment Policies.  In fact, it closely tracks the specific language of the Work Rules.  Initially, the arbitrator cites findings establishing that she considered each of the three factors that the Work Rules state should be considered to determine "the disciplinary action to be taken."  Further, the penalty judged appropriate by the arbitrator for this offense – time off without pay – is one of the four penalties of varying severity specifically listed in the Work Rules and is consistent with the intent of the Employment Policies to authorize a penalty for workplace violence "up to ... termination."[46]

Finally, the arbitrator's statement that her final decision was "just" because it was "corrective in nature, rather than punitive" is no more than a characterization of the principles

---

[44] ECF # 19, Ex. B at 1 (emphasis added).

[45] ECF # 19, Ex. C at 3 (emphasis added).

[46] Tyler maintained at oral argument that, while the language of the CBA is as stated by the arbitrator, the language used in the "zero tolerance" policy did not reflect Tyler's intent in promulgating the "zero tolerance" policy.

-11-

inherent in the Work Rules themselves.[47]  It grafted nothing onto what the Work Rules already specifically provided.  The Rules already mandated multiple types of punishment of varying severity to be applied after considering the severity of the offense through various perspectives.  It is by no means illogical to describe such a range of consequences, to be used after considering specific mitigating factors, as a disciplinary system that is "corrective in nature, not punitive."  But, in any event, the characterization added nothing to the substance of the system itself.

Accordingly, the Court finds that in reducing Staszko's penalty to "time off without pay" and in considering mitigating factors, the arbitrator's decision imposed no new obligation on Tyler, but drew its essence from the agreement.

**2.      *The award is contrary to public policy.***

Tyler asserts that, by reducing the consequences for workplace violence, the award here is contrary to federal and state policies that promote safe workplaces.[48]  The Union

---

[47] Tyler argued at some length in oral argument that, whatever may be true, in general, about a corrective nature to progressive discipline, the "zero tolerance" approach to workplace violence adopted here reflects an intent to "carve an exception" to that rule and substitute an automatic termination policy for any proven case of workplace violence.  In fact, in addition to the previously noted fact that the "zero tolerance" policy came before, not as a subsequent carving out of, the Work Rules, the "zero tolerance" policy itself calls for "[a]ll parties involved in a situation [of workplace violence] will be **counseled** and the results of investigations will **be discussed** with them." ECF # 19, Ex. C at 3.  It is difficult to understand how a policy Tyler insists was meant to require automatic discharge contains within itself a provision mandating counseling and discussion.

[48] ECF # 27 at 13-16.

contends that the arbitrator did not condone Staszko's actions but only determined the appropriate penalty for this infraction according to the CBA.[49]

Tyler has extensively briefed the general question of when and how a court may set aside an arbitrator's award for violating public policy.  Tyler also discussed the issue at some length in oral argument.

The basic rule for a federal court is that where:

> [A]n arbitration award is challenged on public policy grounds, the court must determine whether the arbitrator's interpretation of the contract jeopardizes a well-defined and dominant public policy, taking the facts as found by the arbitrator.[50]

As previously discussed, the CBA itself – both in the Work Rules and in the "zero tolerance" policy toward workplace violence – provides for different levels of discipline to be used after determining mitigating factors.  The provision on workplace violence in the Selected Employment Policies, in particular, commits Tyler to take some disciplinary action for any act of workplace violence but states that the particular action taken will involve selecting from options "up to and including termination."[51]

Tyler seems to argue that the root of the arbitrator's variance from public policy in this matter is in not giving proper weight to Staszko's "history of threatening conduct and violence."[52]  Tyler contends that it had counseled and warned Staszko "on multiple

---

[49] ECF # 29 at 10-12.

[50] *Dana Corp.*, 278 F.3d at 558.

[51] ECF # 19, Ex. C.

[52] ECF # 31 at 4.

occasions" concerning violations of the Work Rules.[53] It is this history that "required Tyler to terminate Staszko for his clear propensity to engage in threatening conduct and violent behavior."[54]

As stated, this Court commences its review of a challenge to an award claiming violation of public policy by "taking the facts as found by the arbitrator."[55] Here, the arbitrator found that Staszko had been employed by Tyler "for seven years with apparently little or no prior discipline. While he was previously involved in a dispute with another employee, the record does not indicate that he has any prior discipline for similar conduct."[56] The arbitrator noted in a footnote, then dismissed as "not relevant," Tyler's arguments based on Staszko's prior criminal record, which had been disclosed to Tyler.[57]

Tyler contended at oral argument that Ohio has a clear public policy requiring automatic termination of anyone found to have engaged in workplace violence. In support, it cited to a recent Ohio appeals court decision that overturned an arbitrator's award reinstating a maintenance worker of the Akron Metropolitan Housing Authority who had

---

[53] *Id.*

[54] *Id.*

[55] *Dana Corp.*, 278 F.3d at 558.

[56] ECF # 19, Ex. D at 7.

[57] *Id.*

been dismissed after accumulating a long record of serious violent acts and been specifically deemed unfit to return to work by his psychologists.[58]

Initially, it is apparent that *Akron* cannot stand for a bright line rule that the public policy favoring workplace safety cannot support a progressive discipline system in cases of workplace violence. The record in *Akron* extensively discussed and relied on by the appeals court, establishes that the employee had first discussed the violent act in question with his supervisor, then received a suspension that was based on an evaluation of his record of poor performance reviews and past discipline.[59] He was then instructed to obtain anger management treatment and receive an authorization to return to work from the treating psychologists before he would be reinstated.[60]

These steps – discussion with the supervisor, followed by a suspension based on a review of his particular record, mandated anger management sessions and a requirement that he be cleared to return to work by the psychologists running the anger management program – are fully consistent with the progressive discipline approach of the agreement here. The recitation of these steps by the *Akron* court without any stated objection to such a process

---

[58] *Akron Metro. Hous. Auth. v. Local 2517, AFSCME*, 161 Ohio App. 3d 594, 831 N.E.2d 493 (2005).

[59] *Id.* at 598-99, 831 N.E.2d at 497. ("At the end of the meeting [with the supervisor], ... Grievant was ... told that some sort of suspension would be involved.... AMHA based its decision to suspend Grievant on the incidents that took place in August 2001. It also took into consideration Grievant's past behavior.... Also introduced were multiple performance evaluations in which Grievant had received poor scores....")

[60] *Id.* at 599, 831 N.E.2d at 497. ("Based on the above occurrences, AMHA felt it was necessary for Grievant to undergo anger-management treatment and receive a return-to-work authorization before he could be reinstated.")

-15-

does not evidence any clear policy of mandating automatic termination for any case of workplace violence.

In fact, as Tyler readily conceded during oral argument, the disciplined employee in *Akron* displayed far more dangerous behavior than Staszko, including having waited in ambush in the snow outside of a supervisor's house with a gun because he had been angry with that supervisor.[61]  Despite that history, the *Akron* court found that the "significant" error by the arbitrator was "not requiring any successful rehabilitative efforts for Grievant's anger condition before his returning to work, despite the findings of counselors and psychologists that stated that Grievant was not ready to return to work."[62]

Not only does *Akron* not stand for Tyler's proposition that the public policy for workplace safety mandates automatic termination of those found to have committed any act of workplace violence, it supports precisely the opposite conclusion that such a public policy is not offended by a discipline scheme that would allow a worker found to have waited in ambush for his supervisor with a gun to return to his employment provided the worker had successfully competed anger management classes.  Far from requiring a reversal of the arbitrator here, it places the award in this case squarely within the acceptable limits of what public policy on safe workplaces will countenance.

---

[61] *Id.* at 496, 831 N.E.2d at 598.

[62] *Id.* at 498-99, 831 N.E.2d at 601.  ("We find it significant ... that the arbitration award in this case was an unconditional reinstatement, not requiring any successful rehabilitative efforts for the Grievant's anger condition, despite the findings of the counselors and psychologists that stated that Grievant was not ready to return to work.") (Citation omitted).

-16-

Under the facts of this case, which under *Dana* form the basis for a federal court to review a claim based on a violation of public policy, it is clear in the first instance that the parties' own agreement, not any decision of the arbitrator, provided for flexible discipline options even for violations of the rules on workplace violence. It is also apparent that the arbitrator was aware of the employment and discipline history of Staszko, including his prior dispute with another employee and his criminal record. It is further apparent that the arbitrator had a factual foundation for concluding that the incident here was not viewed as highly significant by the victim.

Tyler itself agrees that the language in the "zero tolerance" policy allows discipline to be comprised of options "up to and including termination,"[63] with, according to the Work Rules, the particular discipline chosen after "considering [the] seriousness of the offense, [the] employee's overall employment record, [and] previous disciplinary actions."[64] Tyler has, however, contended that such flexible discipline applied after reviewing mitigating factors, in itself, violates the public policy of safe workplaces. Notwithstanding that such an argument would directly vitiate the parties' own agreement here, Tyler has provided no authority to reach that result as a matter of law. Nor can this Court substitute Tyler's preferred view of the facts for those actually found by the arbitrator so as to provide an alternative predicate for another discipline and another result.

---

[63] ECF # 19, Ex. C.

[64] ECF # 19, Ex. B.

3.      *The award disregards the mitigation of damages doctrine.*

Tyler does not dispute the fact established at arbitration that Staszko was self-employed assembling ultra-light airplanes during the time he contested his termination. Rather, Tyler contends that the arbitrator incorrectly considered this self-employment to have mitigated Staszko's damages, contrary to the law on mitigation of damages applicable in this case.[65]  The Union contends that the arbitrator's finding that Staszko mitigated his damages is one of fact "which is not subject to review by this court."[66]

Initially, the holding by the arbitrator that Staszko mitigated his damages by his self-employment is a conclusion of law, not a finding of fact.  There is no dispute as to the underlying fact that Staszko was self-employed during the time he was prosecuting his grievance, but there is a dispute concerning the legal effect of that fact.

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*[67] restated the relevant rubric for examining claimed errors of law in arbitration awards:

> ...[A] separate judicially created basis for vacation [of an award] obtains where the arbitration award was made "in manifest disregard of the law." ...

> This court has emphasized that manifest disregard of the law is a very narrow standard of review.  A mere error in interpretation of application of the law is insufficient. Rather, the decision must fly in the face of clearly established legal precedent.  When faced with questions of law, an arbitration panel does not act in manifest disregard of the law unless (1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrators refused to heed that legal principle.

---

[65] ECF # 27 at 16.

[66] ECF # 29 at 12.

[67] *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Janos,* 70 F.3d 418 (6th Cir. 1995).

... If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed. Only where no judge or group of judges could conceivably come to the same determination as the arbitrators must the award be set aside.[68]

Tyler contends that allowing Staszko's self-employment to mitigate his damages does "fly in the face" of clearly established law that permits mitigation only in cases where the employee made reasonable efforts to find employment substantially equivalent to the position he lost and is suitable to a person of his background and experience.[69] Tyler argues, in essence, that self-employment, by definition, is not comparable to the kind of job Staszko had at Tyler, which paid more and included benefits.

The record is clear and not disputed that Staszko testified at arbitration to working steadily at CGS Aviation, earning between $15,000 and $20,000 per year, for the two years he pursued his grievance.[70] He stated that he did not seek any other employment through the Union. No evidence was adduced at the arbitration concerning his prior wage and benefits package at Tyler.[71]

The general rule as stated by the Sixth Circuit is that a discharged employee must make "reasonable efforts to find new employment which is substantially similar to the

---

[68] *Id*. at 421.

[69] ECF # 31 at 5.

[70] ECF # 23 at 176-78.

[71] *Id.*

position (he lost) ... and is suitable to his background and experience."[72] The burden of proving a failure to mitigate is on the breaching employer.[73]

As the previously stated rule in *Merrill, Lynch* provides, the arbitrator's decision here to construe Staszko's self-employment as mitigation must stand if there is "any line of argument that is legally plausible" to support it and even one judge could "conceivably come to the same determination."[74]

Here, Staszko would be seeking a new job with a criminal record and having been terminated for workplace violence.  In addition, there is nothing in the record to show that he had any particular skill or educational level.  Under those circumstances, it does not "fly in the face" of the law of mitigation to conclude, as did Arbitrator Minnich, that Staszko's assembly work for CGS Aviation was "substantially similar" to his prior work as a shear operator at Tyler[75] and that, most importantly, this work was as "suitable to [Staszko's] background and experience" as could be expected with his criminal record and employment history.

Certainly this Court cannot conclude that "no judge could conceivably come to the same determination"[76] as the arbitrator here concerning the issue of mitigation.

---

[72] *Heheman v. E. W. Scripps Co.*, 661 F.2d 1115, 1125 (6th Cir. 1981).

[73] *Id.*

[74] *Merrill, Lynch*, 70 F.3d at 421.

[75] *See*, ECF # 22, Jt. Ex. 13.

[76] *Merrill, Lynch*, 70 F.3d at 421.

## IV.  Conclusion

Based on the foregoing analysis, the Court finds that there are no genuine issues of fact and that, as a matter of law, summary judgment is appropriate on all claims between Tyler and the Union.

Accordingly, it is hereby ORDERED:

•       The Union's motion for summary judgment is granted.

•       Tyler's motion to vacate the arbitration award is denied, and its complaint is hereby dismissed with prejudice.

IT IS SO ORDERED.


Dated:  November 10, 2005                        s/ William H. Baughman, Jr.
                                                 United States Magistrate Judge